# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

ROBERT E. LEE, JR., et al.,            )
                                       )
            Plaintiffs,                )
                                       )
    v.                                 )        Case No. CIV-14-1391-D
                                       )
CONOCOPHILLIPS COMPANY,                )
                                       )
            Defendant,                 )
                                       )
    v.                                 )
                                       )
MARVIN R. MATHIS,                      )
                                       )
            Additional Defendant       )
            to Counterclaim.           )

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs' Robert E. Lee, Jr. ("Lee"), Hitch Land & Cattle Co. ("Hitch"), Suzanne V. Landess, as Trustee of the Suzanne V. Landess Revocable Trust ("Landess"), and Counterclaim Defendant Marvin Mathis ("Mathis") (collectively "Landowners") Amended Motion for Preliminary Injunction [Doc. Nos. 67 & 72]. Defendant ConocoPhillips ("Conoco") has filed its response in opposition [Doc. No. 69]. An evidentiary hearing was held September 24-25, 2015 and on October 9, 2015, the parties filed their respective closing argument briefs [Doc. Nos. 82-84]. The matter is fully briefed and at issue.

# I.    FINDINGS OF FACT

## A.    THE PARTIES AND SUBJECT LEASES

Pursuant to oil and gas leases executed as far back as the 1930's, Conoco operates gas wells (the Jan #1, Les #1, Elmer 2R and Gertie #1)[1] on Landowners' properties. As additional consideration for permitting Conoco to conduct oil and gas exploration, the leases contain a "free gas clause" by which Conoco agreed to furnish gas, free of charge, to Landowners for domestic use. With the exception of some minor grammatical variations, the leases are uniform in that they permit

> lessors to have gas free of charge from any gas well on the leased premises for stoves and inside lights in the principal dwelling house on said land by making their own connections with the well, the use of said gas to be at the lessors' sole risk and expense.

The gas was to be provided in its raw, natural state, at its natural pressure. Consequently, the use of such "free gas" carried the risk of Hydrogen Sulfide ("$H_2S$")[2] or other impurities being present. Residential gas lines, known as "farm

---

[1]The leases were previously held by Phillips Petroleum Co., Conoco's predecessor-in-interest. Phillips and Conoco merged in August, 2002. For the sake of convenience and for purposes of this Order only, the Court will refer to Conoco throughout, although a referenced action may have been performed by Phillips.

[2]$H_2S$ is a colorless but poisonous and corrosive gas that evolves from the sulfur in crude oil. It has a characteristic offensive odor like that of sewage or rotten eggs. The process of removing $H_2S$ is known as "sweetening" through "scavenger" or "scrubber" units, which, by chemical processes, control $H_2S$ levels to reduce safety and corrosion problems. Additives may also be used to "odorize" the gas to facilitate

taps" or "domestic taps," were subsequently built and connected from Landowners' properties to Conoco's wellheads to allow Landowners to take and use the raw gas. To date, Conoco has provided Landowners with natural gas, free of charge pursuant to the "free gas" lease provision.

Lee has two homes connected to the Jan well. His grandson lives in the principal house and another smaller home is occupied by a hired hand, who leaves during the winter season. Lee receives gas for his irrigation well from Pal Energy, which operates a transmission line approximately three miles from his residence. In August 2014, Lee, with help from Landess, installed a $H_2S$ scavenger unit on his farm tap out of concerns for his own safety and warnings from Conoco about the gas's danger (discussed more fully below). Prior to installation of the scavenger unit, there was no $H_2S$ treatment and the gas entering the homes was not odorized. Lee is vice-president of Hitch, an agricultural and livestock company operating in the Oklahoma panhandle. Hitch owns two houses connected to the Les well. A ranch hand and his wife live in one of the houses, and the other is vacant. Hitch has an irrigation well that is also serviced by Pal Energy. Another gas source from an unidentified commercial provider exists approximately one block from Hitch's property. A metal hut houses Hitch's farm tap equipment, which has not been inspected for safety. Hitch installed

detection in the event of a leak.

a scavenger unit on its pipeline in 2005.

Landess' home is connected to the Jan well, which she also uses to heat her swimming pool. There is no odorizer on the Jan well, and she does not know the pressure of gas which enters the house. Until August 2014, there had been no tests of the $H_2S$ entering her home, though subsequent readings of the Jan and Les wells have repeatedly shown low levels of $H_2S$. Landess also has a home connected to the Elmer 2R well, which is occupied by an employee.

Mathis' residence is connected to the Gertie #1 well. His irrigation well receives gas from West Texas Utilities ("WTU"), which also provides gas to homes near his residence. Mathis has the ability to tap into WTU's distribution line, and pay for gas from that source, and, indeed, purchases gas from WTU for the irrigation well. Mathis has a liquid trap and safety regulator on the line entering his house. Mathis periodically inspects his line for leaks by looking for signs such as dead grass. Mathis does not have any device that extracts $H_2S$ from the gas that enters his home, nor has he ever had the gas tested for its presence, although he testified that the gas "stinks" when the pilot light goes out.

The Jan, Les, and Gertie wells are approximately seventy years old; the Elmer 2R is approximately twenty-five years old. Oil and gas wells, eventually, experience a gradual drop-off in production over time. This is often referred to as a "decline

curve" in petroleum engineering parlance. Using this decline curve methodology, one can calculate and estimate a well's future production (the productive life) based on its production history.[3]

Following execution of the leases, Conoco variably sent letters to Lee, Hitch and Landess (or their predecessors) over the years, which, *inter alia*, reminded them of the risks associated with taking untreated gas, notified them of rules passed by the U.S. Department of Transportation ("USDOT") that affected their farm taps, and urged Landowners to ensure their lines were properly maintained. The letters were consistent in their repeated urging that Landowners find an alternate source of gas. Beginning in 2004, Conoco informed Landowners that due to the presence of $H_2S$, it would disconnect their farm taps. As compensation for the loss, Conoco offered Landowners the option of accepting either a single cash payment or assistance with the costs of converting to an alternate source. Despite its warnings, Conoco's letters failed to persuade Landowners to find an alternate source of gas and they continued to receive gas free of charge via their farm taps.

The parties' dispute sharpened on July 2, 2014, when Conoco notified Lee and

---

[3]There was some testimony that future oil and gas exploration in the area could operate to extend the lives of the leases in question. That at some point in the future, new drilling activity could operate to extend these leases is, of course, inherently speculative, and cannot form the basis for a factual finding in this case.

Landess that, due to the volatile mixture of untreated elements in the gas, it would disconnect the farm taps no later than December 1, 2014. Conoco provided a list of alternate providers and offered a cash buy-out of $40,000 with a $10,000 "timely acceptance bonus." Conoco sent another letter on September 23, 2014, which informed Landowners that their lines were considered to constitute a "distribution line" subject to federal regulations enacted by the USDOT and administered by the Oklahoma Corporation Commission ("OCC"). Conoco claimed these regulations required Landowners' lines to meet certain regulatory requirements and unless Landowners provided proof of compliance, Conoco would shut off the taps by December 1, 2014. On this occasion, Conoco offered Landowners a $40,000 cash payment, minus the costs of converting their lines to an alternate fuel source.

### B.   CONOCO'S DOMESTIC GAS TAP BUYOUT

Beginning in 2003, Conoco began a series of initiatives to "eliminate" farm taps and free gas. Citing concerns over $H_2S$ levels and  what it later considered "onerous state and federal pipeline safety reporting and operational requirements" that were being applied to all farm taps, Conoco devised an incentive plan to persuade Landowners and others using farm taps to waive their rights under the leases, which consisted of the previously mentioned offers of settlement. Conoco's representatives sought funding for these settlements by submitting an Authorization for Expenditure

("AFE"). In an AFE, Conoco supported the initiative by noting "successful buyouts [would] result in additional natural gas sales revenue." The AFE expressed concern about the program's success rate, since, according to Conoco, "[t]his 'free' gas has been a right for these owners for generations and some owners will not accept an offer, even if higher than currently proposed." The most recent settlement proposal was based on a well production life of twenty-eight (28) years.

Conoco's initiatives have been generally successful; most farm taps on its wells in Oklahoma have been eliminated. Only the farm taps involved in the present litigation remain.

## C.    THE ADMINISTRATIVE REGULATIONS

The OCC has developed regulations to assure safety in the design, construction, testing, operation, maintenance, and emergency procedures relating to pipeline facilities. It derives its authority over intrastate pipeline operations through statutes and certification agreements with the USDOT. The Pipeline Safety Department of the OCC administers the Commission's intrastate regulatory program to assure the safe transportation of natural gas and other hazardous materials by pipeline. Relevant to these proceedings, the OCC was given authority to enforce Title 49, Part 192 of the Code of Federal Regulations, which, among other things, covers pipeline safety and Gas Distribution Pipeline Integrity Management Plans. This

provision requires a gas distribution operator to, *inter alia*, develop and implement a program that includes a written integrity management plan. The plan must contain procedures for developing and implementing the operator's understanding of its system, including identifying and evaluating potential threats and risks to the pipeline, conducting periodic evaluations, measuring performance, and submitting written reports addressing said issues. *See* 49 C.F.R. § 192.1007.

In addition to administering the federal regulations, the OCC has enacted its own regulations regarding pipeline construction and safety. *See* OKLA. ADMIN. CODE 165:20-5-34. That provision provides in pertinent part:

(a)     Each operator shall have and maintain its system in such condition as will enable it to furnish safe and adequate gas service, subject only to emergency conditions beyond it[s] control.

(b)     House piping shall conform to requirements of the applicable city or town ordinances. *In towns, villages, and suburban territory where there are no applicable regulations as to gas service, house piping, and venting, operators shall comply with the Standards for the Installation of Gas Appliances and Gas Piping, as set forth in the National Fire Protection Associations No. 54, dated 1969, and future amendments or supplements thereto.*[4] *An operator may decline to serve a consumer or prospective consumer until he has complied with all applicable State and municipal regulations governing gas service and the rules of this Subchapter.*

---

[4]National Fire Protection Association ("NFPA") No. 54 is a safety code that provides minimum safety requirements for the design and installation of gas piping systems in homes and other buildings.

(d)     *All gas supplied to a consumer shall be substantially free of impurities which may cause corrosion of mains, piping, and consumer's appliances, or form corrosive or harmful fumes when burned in a properly designed and adjusted burner.*

*Id*. (emphasis added).

According to the OCC, pursuant to § 165:20-5-34(b), an operator has the responsibility of ensuring that consumer's lines are in compliance with NFPA 54. If it makes the determination the lines are not in compliance, it has an obligation under the regulations to discontinue service until the pipeline is brought into compliance. In addition, subsection (d) has been interpreted by the OCC to require an operator to ensure the gas provided to a consumer is substantially free of any liquids so that it would not freeze and obstruct the meter, and to remove any elements that would be harmful to the customer's piping or equipment. According to the OCC, this requirement to provide so-called "pipeline quality gas" – which has been in existence since the 1980s – extends to the operator, regardless of who owns the pipeline, whether or not the customer pays for the service, and cannot be overridden by agreement.[5] In order to provide "pipeline quality gas" and monitor the wells, Conoco

---

[5]The OCC's recent "interpretation" of its relevant regulations is apparently more expansive than past applications. Indeed, Conoco asserts that it fully became aware of the current interpretation after an OCC employee, Mr. Dennis Fothergill's, deposition in this case.

would incur expenses that approach and potentially exceed $100,000 per well. No evidence was presented to suggest that the OCC has taken any formal administrative action against Conoco regarding farm taps.

### D.   PROCEDURAL HISTORY

On November 18, 2014, Conoco inquired of Lee and Landess about the status of its proposal and stated its $40,000 settlement offer remained open until December 2, 2014. Landowners declined Conoco's offer and filed suit in Texas County District Court, where they sought injunctive relief on the grounds that (1) Conoco's intended shut-off of the farm taps violated its contractual obligations under the leases, and (2) a shut-off during the winter months would cause undue risk of physical harm and property damage as a result of freezing temperatures. Landowners requested a declaratory judgment that Conoco was required to comply with its contractual obligation to make natural gas available to Landowners.

Landowners obtained a Temporary Restraining Order Without Notice in the state court that enjoined Conoco from terminating its supply of free natural gas. Conoco timely removed the action to this Court and filed an Amended Answer and Counterclaim. Conoco cited the personal injury and property damage risks inherent in Landowners' pipelines taking unprocessed, untreated natural gas from the wells. It stated it was not obligated to incur any expense or be exposed to any risk in

allowing Landowners to take the free gas under the subject leases, and Landowners' taking of unprocessed gas, coupled with the aforementioned regulations' practical effects, rendered it impracticable for Conoco to continue allowing Landowners to take gas from its wells. Conoco further stated it was excused from providing gas to Landowners since they did not provide Conoco with certifications or other confirmation that their farm taps met the applicable regulatory requirements. Conoco sought a declaratory judgment that it was not obligated to continue providing natural gas under the leases and it could turn off, disconnect, or otherwise disable the farm taps without incurring liability to Landowners. It further asserted that, if the Court were to determine that shutting off Landowners' farm taps constitutes a breach of the free gas provision, the Court should declare that doing so is subject only to the payment of "properly-measured damages" for such breach. Mathis was added as a defendant to Conoco's counterclaim. Landowners now seek a preliminary injunction prohibiting Conoco from terminating the supply of natural gas via the farm taps.

## II.    STANDARD OF DECISION

A preliminary injunction is considered "an extraordinary and drastic remedy." *Warner v. Gross*, 776 F.3d 721, 728 (10th Cir. 2015) (citing *Munaf v. Geren*, 553 U.S. 674, 689 (2008)). Thus, the movant's right to relief must be clear and unequivocal. *Petrella v. Brownback*, 787 F.3d 1242, 1256 (10th Cir. 2015). Injunctive

relief is an equitable remedy that invokes the sound discretion of the district court, *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980), and "[t]he essence of equity jurisdiction is the power of the court to fashion a remedy depending upon the necessities of the particular case." *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009) (citation omitted); *see also Pymatuning Water Shed Citizens for a Hygienic Environment v. Eaton*, 506 F.Supp. 902, 908 (W.D. Pa. 1980) ("Like any court of equity, the district court has very broad power to fashion a remedy appropriate to deal with the factual situation before the court.") (citation omitted); *Cox v. Northwest Airlines, Inc*., 319 F.Supp. 92, 95 (D. Minn. 1970) ("The purpose of a preliminary injunction ordinarily is to maintain the status quo between the parties until rights can be fully determined by full trial on the merits. However, this Court has the power to shape relief in a manner which protects the basic rights of the parties, even if in some cases it requires disturbing the status quo.") (citations omitted).

"To obtain a preliminary injunction, [Landowners] must show: (1) a likelihood of success on the merits; (2) that they will suffer irreparable harm; (3) that the balance of equities tips in their favor; and (4) that the injunction is in the public interest." *Petrella*, 787 F.3d at 1257 (citing *Att'y Gen. of Okla. v. Tyson Foods, Inc*., 565 F.3d

769, 776 (10th Cir. 2009)).[6] Of all the factors considered, proof of irreparable harm is often the most important in determining whether a preliminary injunction should be issued. *Port City Props. v. Union Pac. R.R.*, 518 F.3d 1186, 1189 (10th Cir. 2008) (observing that "courts have consistently noted" that "a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction").

However, the irreparable harm requirement is not "an easy burden to fulfill." *Dominion Video Satellite, Inc. v. Echostar Satellie Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (citing *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)). To satisfy the requirement, the moving party must prove its injury is "both certain and great, and that it must not be merely serious or substantial." *Id.* (citing *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)). The moving party must also demonstrate that its injury cannot be satisfied by a remedy after trial of an award of monetary damages and that the harm alleged is "of

---

[6]Landowners contend they have shown likelihood of success under the "relaxed" or modified standard utilized by the Tenth Circuit, which requires they only establish that there are questions "so serious, substantial, difficult and doubtful, as to make the issues ripe for litigation and deserving of more deliberate investigation." *Walmer v. U.S. Dept. of Defense*, 52 F.3d 851, 854 (10th Cir.1995). However, this standard applies only where the movant has first satisfied the *other* requirements for a preliminary injunction. *See id.* (citing *City of Chanute v. Kansas Gas and Elec. Co.*, 754 F.2d 310, 314 (10th Cir. 1985)).

such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Schrier v. Univ. of Colorado*, 427 F.3d 1253, 1267 (10th Cir. 2005) (quoting *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)).

## III. CONCLUSIONS OF LAW

### A. FREE GAS CLAUSES

An oil and gas lease possesses a unique, hybrid nature. It is both a contract and a conveyance with continuing obligations. *See, e.g., Enron Oil & Gas Co. v. Lujan*, 978 F.2d 212, 214 n.2 (5th Cir. 1992) ("oil and gas leases are 'both conveyances and contracts'") (citation omitted); 2 EUGENE KUNTZ, *A Treatise on the Law of Oil and Gas* § 18.2 at 4 (1989) (oil and gas lease is simultaneously an interest in real property and an executory contract) (hereinafter "KUNTZ"). The "free gas" clause is a special provision in an oil and gas lease by which the lessor is entitled to receive gas from the leased premises for "domestic purposes" without charge. 4 KUNTZ § 53.6 at 363. Once created, the right to free gas is generally construed to run with the land. *Richardson v. Mustang Fuel Corp.*, 1989 OK 53, ¶¶ 19-21, 772 P.2d 1324, 1328-29.

As noted above, the "free gas" clauses here permit Landowners to "have gas free of charge" from any gas well on the leased premises "for stoves and inside lights in the principal dwelling house on said land by making their own connections with

14

the well, [and] the use of said gas [is] to be at the [Landowners'] sole risk and expense." *Supra*, p. 2. In this regard, the term "dwelling house" has been interpreted beyond its ordinary meaning to include the residence, garage, work house, separate sleeping quarters, and "cluster of buildings in the curtilage." RICHARD W. HEMINGWAY, *The Law of Oil and Gas* § 7.12 at 392 (2d ed. 1983); *see also* 4 KUNTZ at 373. Conversely, if the lease specifies the dwellings for which free gas is to be used, the lessor cannot substitute another dwelling. *Id*. Nevertheless, "[t]he fact that the lessor has used gas for unauthorized purposes does not affect the right to free gas for authorized purposes." 4 KUNTZ § 53.6 at 374 (citing *Scurry Area Canyon Reef Operators Corp. v. Popnoe*, 283 S.W.2d 819, 821 (Tex. App. 1955)).

"Both legal and equitable remedies are available to a lessor if the lessee or his assignee refuses to furnish free gas under the terms of the lease or threatens to cut off the supply." 3A SUMMERS OIL AND GAS § 30:3 (3d ed.) (citing *Schell v. OXY USA, Inc*., 822 F. Supp. 2d 1125 (D. Kan. 2011)). The measure of the amount of damages has been held in the past to be either the value of the gas which should have been provided or the difference in the value of the property with and without the free gas. *See* 4 KUNTZ § 53.6 at 375; HEMINGWAY at 394.

**B.** **ANALYSIS OF FACTORS**

### 1) *Likelihood of Success on the Merits*

The Court's determination of the first factor requires an inquiry into the nature and scope of the obligations at issue. In construing an oil and gas lease, the Court must determine the parties' mutual intent as manifested by language of the instrument. *Skelly Oil Co. v. Wickham*, 202 F.2d 442, 445 (10th Cir. 1953) (citing *Imes v. Globe Oil & Refining Co.*, 1938 OK 601, ¶ 16, 84 P.2d 1106, 1108); *Roye Realty & Dev., Inc. v. Watson*, 1996 OK 93, ¶ 33, 2 P.3d 320, 329 ("Oil and gas leases are to be construed in accord with reasonable intent of the parties, if ascertainable from the four corners of the contract.") (citation omitted). Where ambiguous, the lease is construed most strongly against the lessee and in favor of the lessor. *Foster v. Merit Energy Co.*, 282 F.R.D. 541, 558 (W.D. Okla. 2012); *Simon v. Foster*, 1962 OK 132, ¶ 16, 373 P.2d 28, 30. Where the terms are clear, there is no room for interpretation. *Dilworth v. Fortier*, 1964 OK 112, ¶ 56, 405 P.2d 38, 50. "A fundamental precept of contract law in Oklahoma is that the law will not make a better contract than the parties themselves entered. The judicial function of this Court is to enforce the contract as it is written." *Roye Realty*, 2 P.3d at 329.

In *Schell v. OXY USA, Inc.*, 822 F. Supp. 2d 1125 (D. Kan. 2011), the court was confronted with interpreting free gas clauses that contained language virtually

identical to the leases at issue here, as well as arguments similar to those made by the present parties. After an initial determination that the clauses were ambiguous, the court examined the clauses in their totality and held the leases required the defendant to provide the plaintiffs with free, useable gas:

> [T]he express language of the leases, although ambiguous, is not silent on whether defendant must provide free, useable gas to plaintiffs. The language of the free gas clause, when analyzed as a whole, requires defendant to provide plaintiffs with free, useable gas pursuant to the free gas clauses contained in the leases. Such an interpretation gives effect to all the terms in the clause and provides a reasonable interpretation to the provision at issue.

822 F. Supp. 2d 1125, 1139. The court noted that immediately after the "free of charge" or "free of cost" language, the clause provided the gas was to be used for stoves and inside lights in the principal dwelling house. *Id*. at 1135-36. This, the court determined, was a clear indication that the gas was to be useable, since "a contrary reading would give little meaning to the phrase 'for stoves and inside lights' as unuseable gas would not be suitable for those purposes. . . . Interpreting the lease to require [defendant] only to provide gas, whether it be useable or not, would frustrate the entire purpose of the free gas clause." *Id*. at 1136.

The court in *Schell* made short work of the defendant's argument that the leases' requirement that the plaintiffs take the gas at their "sole risk and expense" placed the burden upon the plaintiffs to convert the gas into a useable form:

This court believes defendant's interpretation goes well beyond what the express language provides and directly contradicts other terms in the clause. First, the free gas clause provides that lessors are entitled to free gas for domestic purposes. As noted above, this necessarily means free useable gas. Thereafter, the clause provides "the use of such gas be at lessors' sole risk and expense." *This "sole risk and expense" language comes into play only after the lessee has fulfilled its obligation to provide lessors with free, useable gas for domestic purposes.* Careful examination of the lease language confirms this. The words "the use of such gas" appear later in the clause, after the language stating the free gas is for domestic purposes. The most reasonable construction of the risk and expense language is that it applies to the gas intended and suitable for domestic purposes. Hence "such gas" means "useable gas." After the gas is in a useable form, the lessors bear the risk and expense of using that gas in their homes. Such risks and expenses presumably include the dangers of using natural gas within a home for heat or to run appliances and the costs of purchasing equipment necessary to harness the natural gas for domestic purposes. . . . Interpretation of the clause in this manner is consistent with and gives further meaning to the "for stoves and inside lighting" provision. . . . Thus, the provision is more accurately interpreted to mean that plaintiffs bear the "sole risk and expense" of using the free gas, but only after defendant has provided plaintiffs free, useable gas.

*Schell*, 822 F. Supp. 2d at 1136-37 (citations omitted, emphasis added).

The Court likewise finds, for the same reasons articulated by the court in *Schell*, the subject leases in this case are ambiguous and, construing the language most strongly against Conoco, also finds they require Conoco to provide Landowners with free, useable gas.[7] The grammatical order of the lease language in this case bears

---

[7]Much of the evidence and testimony presented during the preliminary injunction hearing focused on Conoco's contention that the raw, wellhead gas obtained via the farm taps is potentially dangerous and unsuitable for domestic use,

no meaningful difference from the leases examined in *Schell* and the Court finds no compelling reason to reach a different conclusion. Although Conoco cites the aforementioned regulations as imposing unreasonable hardships and altering the parties' intended relationship, the Court has closely examined the regulations and does not interpret them as being so preclusive. First, the Court has already determined that, under the leases, Conoco bears the responsibility of providing free, useable gas. Second, notwithstanding the fact this obligation could bear considerable expense for Conoco, Landowners' right to free gas was part of the consideration for, and a right granted by, the subject leases, and Conoco cannot disregard its obligations out of mere inconvenience or expense. The *Schell* court, citing *Bassell v. W.Va. Cent. Gas Co.*, 103 S.E.116 (W. Va. 1920), addressed this precise issue where it noted *Bassell* held, for the same reasons above, the defendant bore the responsibility and obligation of providing free gas, even where doing so would "entail considerable expense." *Id*. at 1133 (citing *Bassell*, 103 S.E. at 118). Conoco's argument regarding the added risks is not substantially different from the attendant risks it has in conducting its exploration and production activities.

Third, the Court does not interpret Conoco's purported obligation to ensure

---

and its related contention that it is not required to provide Landowners with "pipeline quality gas" because of the operation of the "lessors' sole risk and expense" clause.

Landowners' lines are in regulatory compliance to mean it can arbitrarily shut off the farm taps and permanently discontinue service in violation of its contractual obligation to provide free useable gas. This is especially true where Conoco has been providing such services for years without substantial interference or interruption. Lastly, the fact Landowners may use the gas for purposes other than that specified in the leases does not, in the Court's view, constitute a material breach that would justify the cessation of such rights, since "[t]he fact that the lessor has used gas for unauthorized purposes does not affect the right to free gas for authorized purposes." *See* 4 KUNTZ, *supra* at 374. In sum, the likelihood of success factor weighs in Landowners' favor.

### 2) *Irreparable Harm*

Although Landowners have shown a likelihood of success on the merits, the Court finds they have failed to show irreparable harm. As noted above, damages may be measured by either using the value of the gas which should have been provided or the difference in the value of the property with and without the free gas. Also, evidence at the preliminary injunction hearing showed the production life of a well may be determined by using the "decline curve" methodology. Moreover, ample evidence was introduced which establishes that Landowners have available to them alternate means of obtaining natural gas or the option of converting their fuel supply

to propane. Of course, the utilization of either alternative is an exercise for which monetary damages would suffice to make Landowners whole. Consequently, the Court finds Landowners have failed to show that money damages would not be sufficient to compensate for any potential future injury. Notably, the *Schell* court denied the plaintiffs' request for a permanent injunction on, among other things, the grounds that the plaintiffs could be compensated by money damages to redress any future injury. *Schell*, 822 F. Supp. 2d at 1142. Likewise, if Conoco terminates Landowners' supply of free gas, Landowners may pursue a breach of contract claim to recoup their losses. *Id*.

Because Landowners have failed to make an adequate showing of irreparable harm, the Court need not consider the remaining factors regarding the issuance of a preliminary injunction. *See Heideman*, 348 F.3d at 1188-89 ("It is the movant's burden to establish that *each* of these factors tips in his or her favor.") (citing *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001) (emphasis added)); *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) ("Because [plaintiff] has made no showing of irreparable injury here, that alone is sufficient for us to conclude that the district court did not abuse its discretion by rejecting [its] request. We thus need not reach the district court's consideration of the remaining factors relevant to the issuance of a preliminary injunction.").

## IV. SUMMARY OF RULING

The Court finds Landowners are not entitled to a preliminary injunction as they have failed at this stage to show irreparable harm. However, the fact that the Court has denied Landowners' request for *preliminary* injunctive relief does not necessarily preclude equitable relief following a full trial on the merits of the parties' respective claims. If Conoco chooses to act on its stated intent to shut off Landowners' farm taps even pending the final adjudication of this case, the Court directs Conoco to reasonably assist Landowners in locating and connecting to an alternative source of energy, and to temporarily refrain from shutting off the farm taps for a reasonable time in order to allow such alternative sources to be put in place.[8]

## V. CONCLUSION

For the reasons stated, Landowners' Amended Motion for Preliminary Injunction [Doc. Nos. 67 & 72] is **DENIED**. Conoco's Motion for Leave to Correct Misstatements in Landowners' Closing Arguments [Doc. No. 85] is **DENIED** as moot.

---

[8]The Court is particularly mindful of the timing of this Order, issued at the beginning of the winter season and on the heels of a winter storm that has significantly impacted the area of the state where Landowners reside. Recognizing that this Order addresses only Landowners' rights to *preliminary* injunctive relief, the Court reminds the parties that they have invoked the Court's equity jurisdiction, and the Court enjoys broad equitable powers to fashion appropriate remedial orders and grant effective equitable relief.

IT IS SO ORDERED this 5th day of January, 2016.

TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE